UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | ) |
| RENAISSANCE DEVELOPMENT | ) |
| CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 15-10463-LTS |
| | ) |
| BUCA V, LLC, BUCA, INC., AND | ) |
| BUCA RESTAURANTS, INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 30)

November 10, 2015

SOROKIN, J.

On February 20, 2015, Plaintiff Renaissance Development Corporation ("Renaissance")

filed a complaint in this Court against Buca V, LLC d/b/a Buca Di Beppo, Buca, Inc., and Buca

Restaurants, Inc. ("the Buca Defendants"). Doc. No. 1. Specifically, the complaint alleges that

the Buca Defendants have breached their commercial lease agreement with Renaissance by

failing to pay rent. Before the Court is Renaissance's Motion for Summary Judgment on Counts

One and Two of its complaint. Doc. No. 30. The dispute concerns the allocation of the risk

between the landlord and the tenant of an interruption in the tenant's business arising from a

public road construction project. Because the Lease allocates that risk, at least in the present

circumstances, to the tenant, Renaissance's Motion for Summary Judgment is ALLOWED on all

counts.

I.       UNDISPUTED FACTS

The Buca Defendants consist of Buca, V, LLC ("Buca V"), Buca, Inc. ("Buca"), and

Buca Restaurants, Inc. ("BRI").  The premises at issue is located at 7 Boston Turnpike,

Shrewsbury, Massachusetts, on the westbound side of Route 9.  Buca V operates a Buca Di

Beppo restaurant ("the Restaurant") on the premises.  Doc. No. 42 ¶ 35.  The premises is

adjacent to a bridge that runs across Lake Quinsigamond called the Kenneth F. Burns Memorial

Bridge ("the Bridge").  Id. ¶ 36.  Renaissance and Buca V are parties to a Commercial Property

Lease ("the Lease") governing the Shrewsbury premises, and Buca and BRI are guarantors of the

Lease.[1]

In or around 2012, the Massachusetts Department of Transportation undertook a

construction project to replace the Bridge.  Doc. No. 42 ¶ 37.  The Commonwealth's

construction project began harming the Restaurant's profitability in the summer of 2014, and in

January 2015, the Restaurant closed its doors to customers.  Id. ¶¶ 40-43, 76-77.  The

Restaurant's profitability plummeted during the construction mostly due to its interference with

accessibility to the Restaurant's entrance.  Id. ¶¶ 48-53.  The construction made the westbound

entrance "hard to spot" from the highway "due to the numerous construction vehicles located in

and around the entrance and obscured signs."  Id. ¶ 49.  Further, the construction "eliminated the

---

[1] The original Lease, signed on February 2, 2001, was between Renaissance and S&S Restaurant
Associates Limited Partnership.  Doc. No. 32, Exhibit 1.  Between 2001 and January 1, 2014,
when Buca V, LLC was assigned the right, title, and interest in the Lease, other assignments of
the Lease took place.  Id. at Exhibits 2 & 3.  The original Lease was also amended twice.  Id. at
Exhibit 4, § 8; Id. at Exhibit 5, § 9.  The assignments and amendments did not alter the rights or
obligations of the parties under the Lease in any way, except that the amendment signed by
Renaissance and Buca V contained a provision stating that Renaissance had "satisfied all of its
obligations under the [original] Lease."  Doc. No. 42 ¶ 26.  That Amendment also provided that
Buca and BRI would serve as guarantors of the Lease and Buca V's obligations under the Lease.
Doc. No. 42 ¶ 34; Doc. No. 32, Exhibit 6.

ability to make a U-turn," forcing customers who missed the entrance to exit the highway and take a more indirect route back to the restaurant.  Id. ¶ 50.  Turning into the entrance from the eastbound side of the highway was also difficult for customers because of the entrance's limited visibility.  Id. ¶ 52.  At one point, for "numerous days," the westbound entrance was completely inaccessible due to the attempted replacement of the water main lines.  Id. ¶ 60.  In addition to impaired access due to the construction, guests could feel pounding and vibrations while in the Restaurant, and complained of dust and debris from the construction.  Id. ¶¶ 57-59, 72.  Further, the water to the restaurant was shut off at various times without warning, and sometimes came out brown when working.  Id. ¶¶ 67-71.  Neighboring businesses, including other restaurants, experienced similar difficulties with the construction and lost business as a result.  Doc. No 38, Exhibit 10.

In or around November of 2014, Buca V ceased paying rent and real estate taxes.  Doc. No. 42 ¶ 18.  Renaissance sent a demand letter to the Buca Defendants on January 16, 2015, to which the Buca Defendants did not respond.  Id. ¶ 19; Doc. No. 32, Exhibit 8.  Soon thereafter, Renaissance learned that Buca V had vacated the premises, but still remained in possession of the premises.  Doc. No. 42 ¶¶ 20, 24.

On February 20, 2015, Renaissance filed a complaint for breach of lease against Buca V and breach of guaranty against Buca and BRI.  Doc. No. 1.  Renaissance contends that the Buca Defendants breached the Lease by ceasing to pay rent and abandoning the premises, and that as of the date of the complaint the Buca Defendants owed Renaissance $206,513.44.  Id. at 1.  Renaissance has moved for an entry of summary judgment in its favor on its breach of lease and breach of guaranty counts against the Buca Defendants.  Doc. No. 30.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

The parties do not dispute that the Buca Defendants failed to pay rent, thus breaching the Lease.  Further, the Buca Defendants do not contend that Renaissance failed to fulfill any of its obligations under the Lease.  Nor do the parties dispute that the Restaurant's failure was caused by the Bridge construction.  Doc. No. 36 ¶ 25.  Indeed, the Buca Defendants make no claim that Renaissance did anything wrong.  Doc. No. 35 at 11.  Rather, the Buca Defendants contend that an issue of material fact exists as to whether they are excused from fulfilling their obligation to

pay rent under the provisions of the Lease.  Id. at 9-10.  Specifically, they contend that the

Bridge construction that disrupted their business may have constituted a taking, thus triggering

either section 12.3, 12.4, or 12.5 of the Lease.  Those provisions of the Lease contemplate

situations in which the leased property is taken by a condemning authority.

     A.    The Provisions of the Lease

The Buca Defendants do not argue that the Commonwealth initiated a formal taking

proceeding in order to make use of the leased premises for the Bridge construction.  Rather, the

Buca Defendants contend that the Bridge construction that disrupted their business constituted a

taking by means of inverse condemnation, thus triggering section 12.3, 12.4, or 12.5 of the

Lease.  Doc. No. 35 at 8.  Determining whether ambiguity exists within a contract is a matter of

law that the court may decide pursuant to a motion for summary judgment.  See, e.g., Smart v.

Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995).  "Absent an ambiguity,

the court interprets a contract 'according to its plain terms,' in a manner that gives reasonable

effect to each of its provisions."  Weiss v. DHL Express, Inc., 718 F.3d 39, 45 (1st Cir. 2013)

(citations omitted) (quoting Den Norske Bank AS v. First Nat'l Bank of Bos., 75 F.3d 49, 52 (1st

Cir. 1996)).  For the following reasons, sections 12.3, 12.4, and 12.5 of the Lease are

unambiguous and do not apply to the Buca Defendants' circumstances.[2]

     1.    Sections 12.3 and 12.4

The Buca Defendants first contend that an issue of material fact exists as to whether they

are excused from paying rent under sections 12.3 and 12.4 of the Lease.  Section 12.3 (entitled

"Total and Partial-Permanent Condemnation") states in relevant part:

---

[2] In interpreting the Lease, the Court looks to Massachusetts law because the Lease states that it "shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts."  Doc. No. 32, Exhibit 1, § 26.4.

> If at any time during the term of this Lease or any extension thereof, part or the entire [premises] or such other portion thereof as would render the balance of the [premises] not suitable for the use to which the [premises] was being utilized immediately prior thereto by the Lessee, shall be taken or appropriated by any competent authority for public or quasi-public use, at Lessee's option this Lease shall terminate upon the date that possession is surrendered to the condemning authority, at which time all rights and obligation between the parties shall cease and all rents and other charges shall be equitably apportioned. . . . The Lessee may elect not to terminate this Lease and in such an event Base Rent and Percentage Rent shall be decreased pro-rata for the remaining period of this Lease, including any options, to reflect the economic impact of the taking relative to the rental value of the [premises].

Doc. No. 32, Exhibit 1, § 12.3.  Section 12.4 (entitled "Total-Temporary Condemnation") states

in relevant part:

> If the whole of the [premises] or such portion thereof as would render the use of either property, not suitable for Lessee's use as set forth above, shall be taken for a period of one (1) year or less, the term of this Lease shall be tolled and, all rent and other charges payable to Lessor shall abate from the time possession of the premises is surrendered to the taking authority and recommence when possession is restored to the Lessee.

Id. § 12.4.

These provisions are clearly inapplicable to the present set of circumstances.  First, as

evident from its title, section 12.3 applies only where there is a *permanent* taking.  The Buca

Defendants do not dispute that the Commonwealth expects to have completed the construction

by the end of 2015.  Doc. No. 38, Exhibit 11.  Nor do the Buca Defendants contend that the

Commonwealth will continue to interfere with their use of the premises once the Bridge

construction is complete, or that anything about the alleged taking is permanent in nature.[3]  Even

if the headings have no interpretive significance (something not provided for in the Lease

---

[3] Whether the parties intended for the word "permanent" in the Lease to mean indefinitely or through the remainder of the Lease is irrelevant.  The Lease does not end until May 31, 2020, more than five years after the expected completion of the Bridge construction.  Doc. No. 42 ¶ 6.

although amendments to the Lease do so provide, see Doc. No. 32, Exhibit 4, ¶ 11 & Exhibit 5, ¶ 12), section 12.3 nonetheless remains inapplicable for the reasons set forth below.

The language of sections 12.3 and 12.4 requires that the condemning authority *physically* invade the premises in order to trigger either of those provisions.  Both provisions apply only when "possession is surrendered."  Doc. No. 32, Exhibit 1, § 12.3 & 12.4.  As tenants, the Buca Defendants have possession, a term which means "actual and physical control."  See Black's Law Dictionary (6th ed. 1990) (defining "possess" as "to have in one's actual and physical control," and "actual possession" as "immediate occupancy and physical control").  The word "surrender," especially when used in the landlord-tenant context, coupled with the word "possession," means to turn over physical possession and control to another, such as when a tenant surrenders possession to a landlord and the landlord accepts possession.  See id. (defining "surrender" in landlord-tenant law as when "the tenant voluntarily gives up *possession* of the premises prior to the full term of the lease and the landlord accepts possession with intent that the lease be terminated") (emphasis added).  Moreover, the "possession" surrendered under this Lease is possession of "the premises," confirming that surrender of possession requires a turning over of physical and actual occupation of the premises not merely an interference with use.

Elsewhere, the Lease defines the procedures for the Lessee to follow in making a "surrender" to the landlord.  Doc. No. 32, Exhibit 1, § 17.1.  To surrender properly, the tenant must "remove all Lessee's goods and effects from the Demised Premises" and "deliver to Lessor the Demised Premises and all keys and locks thereto."  Doc. No. 32, Exhibit 1, § 17.1.  In other words, the Lease treats surrender, albeit in a somewhat different context, as requiring a transfer of physical possession of the property.  Thus, the phrase "possession is surrendered" means physical possession of the premises is surrendered to the taking authority.  The Buca Defendants

do not contend that that occurred.   In fact, they concede that they remain in possession of the premises, and contend only that the construction site interfered with the Buca Defendants' use of the premises in that it obstructed traffic on the highway, created noise, deterred business, and at times interfered with utility services.

Finally, the conditions on relief imposed by both sections 12.3 and 12.4 confirm the foregoing reading.  Each section requires surrender of possession "to" the "condemning" or "taking authority."  Doc. No. 32, Exhibit 1, §§ 12.3 & 12.4.  Such language necessarily, especially in this context, means that the public authority is taking physical possession of the premises from the lessee who has surrendered it.  The Buca Defendants do not dispute that they remain in possession of the premises.  Doc. No. 42 ¶ 23.  They advance no contention, nor any evidence, that they surrendered the premises or any portion thereof to any public authority or entity.  The language of the Lease requiring surrender of possession of the premises to the condemning or taking authority does not reach or encompass what the Buca Defendants describe: the Bridge construction's interference with the Buca Defendants' operation of a restaurant constitutes both a taking and a surrender while the Buca Defendants remain in physical possession of the premises.[4]

Accordingly, the circumstances described by the Buca Defendants, even if proved in the course of the discovery they seek, fail to invoke either Section 12.3 or Section 12.4 of the Lease.

---

[4] The Court rejects the Buca Defendants' theory on the merits.  However, even accepting the Buca Defendants' theory that both a taking and a surrender, within the meaning of the Lease, occurred, thus triggering either section 12.3 or 12.4, the theory proves too much.  The parties stipulated at the motion hearing that the Bridge construction concluded in August, 2015. Pursuant to the Buca Defendants' theory, they resumed possession at that time and with the resumption of possession the obligation to pay rent.  To date, based on the representations of counsel, the Buca Defendants have not paid nor offered to pay rent for the period commencing with the conclusion of construction or anytime thereafter.

2.      Section 12.5 of the Lease

The Buca Defendants also contend that an issue of material fact exists as to whether they

might be excused from paying rent under section 12.5 of the Lease.  Section 12.5 (entitled

"Partial-Temporary Condemnation") states:

> If less than the whole of the [premises] or any such portion thereof as would render
> the use of the [premises] restricted for Lessee's purposes as aforesaid is taken then
> the basis for Lessee's damages against the condemning authority, if allowable, or
> against the total award shall be as suffered by Lessee for the interruption of Lessee's
> business and such additional relief as may be provided by law.  Subject to the terms
> of Section 12.3 and 12.4 Lessee shall continue to pay rent during such period.

Doc. No. 32, Exhibit 1, § 12.5.  This provision is not explicitly conditioned on the Buca

Defendants "surrendering possession" to a "condemning authority."  Further, because the

provision does not use the terms "possession" or "surrender," it might arguably encompass an

interference with use of the premises that amounts to an inverse taking under Massachusetts law,

such as the one alleged by the Buca Defendants.  However, that is of no assistance to the Buca

Defendants' circumstances.  Section 12.5 does not excuse the obligation to pay rent in the

circumstances described by the Buca Defendants.  First, section 12.5 contemplates damages

against the "condemning authority" as a remedy, and not against Renaissance in the form of rent

reduction.  The final sentence commands that the Lessee "*shall continue to pay rent* during such

period" (i.e. the period of the partial temporary condemnation).  Doc. No. 32, Exhibit 1, § 12.5

(emphasis added).  The language admits of one exception to this unequivocal command:  the

obligation to pay rent during the temporary condemnation period is "[s]ubject to the terms of

Section 12.3 and 12.4."  Id.  As discussed in Part A.1, supra, sections 12.3 and 12.4 are

unambiguously inapplicable to the present situation.  Section 12.5 therefore does not excuse the

Buca Defendants from paying rent.[5]

### 3.    The Lease as a Whole

The Lease read as a whole unambiguously places the risk of temporary, non-invasive

interferences on the Buca Defendants, and thus supports the foregoing interpretation of sections

12.3, 12.4, and 12.5.  <u>Ryan v. Boston Hous. Auth.</u>, 77 N.E.2d 399, 401 (1948) (citing "the

general rule for construction of leases that all provisions should be read together and where

possible all the language given a reasonable meaning").  First, Section 21.1 explicitly provides:

"Except as provided for in sections 4.1, 5.1, 6.1 and 12.1 of this Lease, no abatement, diminution

or reduction of rent shall be claimed or allowed to Lessee . . . under any circumstances, whether

for inconvenience, discomfort, *interruption of business* or otherwise."  Doc. No. 32, Exhibit 1, §

21.1 (emphasis added).  The plain language of this provision suggests that when the Buca

Defendants signed the Lease, they agreed that they would not be excused from paying rent for

interference with their business unless Section 4.1 (regarding the Lessee's responsibility to pay

for utilities until the expiration of the Lease term), 5.1 (regarding the Lessee's responsibility to

comply with federal, state, and local laws), 6.1 (regarding the distribution of costs associated

with maintenance of the premises), 12.1 (regarding the Lessor's responsibilities in the event of a

fire or other casualty) or another provision of the Lease providing expressly for abatement of rent

was triggered.  Each of those exceptions is clearly inapplicable to the Bridge construction

---

[5] The Court's interpretation does not render the subject language superfluous.  Section 12.5
encompasses not only the type of alleged temporary non-invasive inverse taking claimed by the
Buca Defendants (which is not within the scope of Sections 12.3 and 12.4), but also at least some
of the physical takings that are within Sections 12.3 and 12.4.  Section 12.5 establishes both a
damages rule applying to all takings within its scope, and reiterates that the Lessee must continue
to pay rent unless excused under the specific provisions set forth in Sections 12.3 and 12.4.

interfering with the Restaurant's business, and thus the Buca Defendants may not claim any "abatement, diminution or reduction of rent" for that reason.

Second, as a general matter, the conclusion that the Buca Defendants assumed the risk of temporary, non-invasive interferences like the Bridge construction when it signed the Lease is consistent with the Lease as a whole.  According to the provisions of the Lease, the Buca Defendants, rather than Renaissance, bear almost all risks and responsibilities associated with operating a restaurant on the premises.  For example, the Buca Defendants are responsible for all utility arrangements and payments (Doc. No. 32, Exhibit 1, § 4.1), maintenance of all portions of the premises aside from the roof (Id. §§ 6.1-6.4), liabilities and losses to any person or property on the premises (Id. §§ 11.1, 20.1, 26.8), legal claims arising from acts on the premises (Id. § 11.1), damage to the premises (Id. § 12.2), and purchasing fire and liability insurance (Id. §§ 13.1, 14.1).  Further, Section 26.8 clarifies that Renaissance is not liable for any losses suffered by the Buca Defendants unless those losses are caused by Renaissance's failure to fulfill its obligations.  Id. § 26.8; see also id. § 6.1.  The Buca Defendants do not dispute that Renaissance has fulfilled all of its obligations under the Lease to date, and that the Bridge construction and the Restaurant's subsequent losses are unrelated to Renaissance's obligations as Lessor.

Finally, Mass. Gen. Laws ch. 79 provides various causes of action to obtain compensation from the government for interfering with the use and enjoyment of property, and the Lease itself recognizes the existence of such actions.  See Doc. No. 32, Exhibit 1, §§ 12.4, 12.5.  In the commercial real estate context, the lessee (who is in possession of the premises and operating a business on the premises), rather than the lessor, is in the best position to evaluate any possible inverse temporary takings claims against the government and to determine the compensable losses suffered.  The Lease, by placing the risk of such losses on the Lessee,

aligned the risk with the party with knowledge of the injury.  Thus, both on its face and in light

of policy considerations, the Lease is unambiguous in that the risk of temporary, non-invasive

interferences falls on the Buca Defendants.

      B.    Rule 56(d)

The Buca Defendants urge this Court to either deny or defer its ruling on Renaissance's

Motion for Summary Judgment in order to allow for further discovery under Fed. R. Civ. P.

56(d).  Doc. No. 35 at 12.  "To invoke Rule 56(d), a party must furnish the district court with a

timely statement that '(i) explains his or her current inability to adduce the facts essential to

filing an opposition, (ii) provides a plausible basis for believing that the sought-after facts can be

assembled within a reasonable time, and (iii) indicates how those facts would influence the

outcome of the pending summary judgment motion.'"  Nieves-Romero v. United States, 715

F.3d 375, 381 (1st Cir. 2013) (quoting Velez v. Awning Windows, Inc., 375 F.3d 35, 40 (1st Cir.

2004)).  The Rule also "requires due diligence both in pursuing discovery before the summary

judgment initiative surfaces and in pursuing an extension of time thereafter."  Resolution Trust

Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994).  Finally, "the district court

is entitled to refuse a Rule 56(d) motion if it concludes that the party opposing summary

judgment is unlikely to garner useful evidence from supplemental discovery."  Hicks v. Johnson,

755 F.3d 738, 743 (1st Cir. 2014).

To support their argument under Rule 56(d), the Buca Defendants provided the Court

with an affidavit signed by their attorney, Daniel Sonneborn.  Doc. No. 38.  By providing a draft

subpoena to be served on the Commonwealth that sets out ten categories of documents sought,

id., Exhibit 13, the Sonneborn affidavit "provides a plausible basis for believing that the sought-

after facts exist and can be assembled within a reasonable time."  Velez, 375 F.3d at 40.  Both

the affidavit and the Buca Defendants' memorandum in opposition to the Motion for Summary

Judgment, however, fail to fulfill each of the remaining requirements of Rule 56(d).

The affidavit fails to demonstrate how the discovery the Buca Defendants seek from the

Commonwealth would affect the Court's analysis of Renaissance's Motion for Summary

Judgment.  See Resolution Trust Corp., 22 F.3d at 1207 ("[T]he facts that the movant seeks to

discover must be foreseeably capable of breathing life into his claim or defense.").  In their

opposition to Renaissance's motion, the Buca Defendants state that they seek further discovery

to "establish that the Commonwealth's actions amount to a taking . . . within the meaning of

Section 12.3."  Doc. No. 35 at 12.  As discussed in Part A, supra, however, the Buca Defendants'

defense turns not on whether the Bridge construction's interference with their business

constitutes a taking, but on whether their situation satisfies the other conditions set out in

Sections 12.3 and 12.4 of the Lease, including surrender of possession to a condemning

authority.  While the burden of demonstrating materiality under Rule 56(d) is relatively low, the

Buca Defendants have not suggested that more facts regarding the Bridge construction would

alter this Court's conclusions regarding the conditions of sections 12.3 and 12.4, or the

conclusion that Section 12.5 does not excuse the Buca Defendants from paying rent in any

circumstance.  Discovery from the Commonwealth regarding the *Commonwealth's* construction

project has no bearing on the meaning of the private agreement between *the Buca Defendants*

*and Renaissance*.  Thus, because the Buca Defendants are "unlikely to garner useful evidence

from supplemental discovery," the request under Rule 56(d) is denied.  Hicks, 755 F.3d at 743.

IV.   CONCLUSION

For the foregoing reasons, Renaissance's Motion for Summary Judgment (Doc. No. 30)

is ALLOWED on all counts.  Within seven days, the parties shall file a proposed form of

judgment conforming to the Court's opinion.  By joining in the proposed form of judgment,

Defendants do not waive any objections or rights of appeal.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge